**HON. BARBARA J. ROTHSTEIN**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED FINANCIAL CASUALTY COMPANY,<br><br>                    Plaintiff,<br><br>    v.<br><br>AMAN EXPEDITE, LLC; VITALI KONKO; the ESTATE OF DMYTRO PRONIN; MALIK TRUCKS LLC; and MALIK KOSSUNOV<br><br>                    Defendants,<br><br>AND<br><br>CHAD HORNER, as Administrator or the Estate of Dmytro Pronin,<br>           Crossclaim & Third-Party Plaintiff,<br><br>    v.<br><br>AMAN EXPEDITE LLC; and VITALII KONKO,<br>           Crossclaim Defendants,<br><br>AND<br><br>DAIMLER TRUCKS NORTH AMERICA, LLC; SELECTRANSPORTATION RESOURCES (D/B/A HOUSTON FREIGHTLINER); PITREMODELING INC; RALF AND TRANSPORTATION INC; PETRO FEDELESH; MALIK TRUCKS LLC; MALIK KOSSUNOV; and FORCE TRANS INC,<br><br>           Third-Party Defendants. | NO. 2:23-cv-00587-BJR<br><br>**ORDER GRANTING DAIMLER TRUCKS NORTH AMERICA, LLC'S MOTION TO DISMISS** |

1

## I.   INTRODUCTION

This lawsuit arises from the tragic death of Dmytro Pronin who was killed in a traffic accident between two freightliners on October 1, 2022. Currently before the Court is Third-Party Defendant Daimler Trucks North America, LLC's ("DTNA") motion to dismiss pursuant to Fed. Rule Civ. P. 12(b)(6), which is opposed by Third-Party Plaintiff the Estate of Dmytro Pronin ("the Estate"). Dkt. Nos. 121, 126.  Having reviewed the motion, response, and reply thereto, as well as the record of the case and the relevant legal authority, the Court will grant the motion with leave to amend. The reasoning for the Court's decision follows.[1]

## II.   FACTUAL BACKGROUND

In 2021, DNTA designed and manufactured a freightliner box truck ("the Freightliner") that was purchased by SelecTransportation Resources, LLC d/b/a/ Houston Freightliner, Inc. ("Houston Freightliner") and sold to Aman Expedite, LLC ("Aman Expedite"). Although DNTA had been offering forward collision warning, automatic emergency braking, and active brake assist technologies as optional features on its trucks, the Freightliner was not equipped with these features.

In August 2021, after it purchased the Freightliner from Houston Freightliner, Aman Expedite contracted with Petro Fedelesh, PITRemondeling Inc, and/or Ralf and Transportation Inc. (collectively "PIT") to construct a sleeper berth in the back of the Freightliner. The Estate alleges that the Freightliner was "originally manufactured for day

---

[1] Plaintiff United Financial Casualty Company ("United Financial") originally instituted this lawsuit in April 2023 seeking a declaratory judgment that it does not owe insurance defense or indemnity coverage obligations for potential claims arising from the accident. However, the lawsuit has since expanded to include multiple cross and third-party claims including, relevant to the instant motion, the Estate's third-party claims against DNTA. The underlying insurance claims are not relevant to the instant motion and will not be discussed here.

use and had nowhere in the crash-worthy passenger compartment to install a sleeper berth." Dkt. No. 78 at ¶ 72. The Estate claims that PIT "cut a hole in the rear of the cab's passenger safety compartment, through into the cargo box" and "used wood to frame out" a berth "in the area at the front of the cargo box, just behind the passenger safety compartment." *Id*. at ¶ 74 a.- b. The Estate further alleges that PIT failed to use "high-strength steel reinforcements to keep the sleeper berth enclosed and intact" or "connected to the passenger safety compartment in the event of an accident." *Id*. at ¶ 74 f. – g. Nor did it install restraints to protect someone sleeping in the berth in the event of an accident.

On October 1, 2022, Vitali Konko was driving the Freightliner on Highway 70 in Silverton, Colorado, while Mr. Pronin was riding in the sleeping berth. The Estate alleges that Mr. Konko was driving around 50-55 mph when he saw a semi-truck in the lane in front of him going very slowly with its hazard lights on. The Estate further alleges that instead of applying the Freightliner's brakes, Mr. Konko decided to change lanes, and looked over his shoulder to check for traffic. However, when he looked back towards the front, he realized that the semi-truck was too close, so he swerved but was unable to avoid hitting the semi-truck. The Estate claims that "[t]he impact was not particularly violent, as highway crashes go" and it "did not cause any intrusion into the [Freightliner's] passenger safety compartment." Dkt. No. 78 at ¶¶ 117-118. In fact, the Estate alleges, the Freightliner's "build [*sic*]-to-regulation passenger safety compartment proved more than adequate to remain intact and protect its occupants … ." *Id*. at ¶ 119.

However, the same cannot be said for the recently installed sleeper berth. The Estate alleges that "the sleeper berth was completely destroyed" in the accident. *Id*. at ¶ 120. Specifically, the berth was torn from the rear wall of the passenger compartment,

thrown rearward, and parts of the berth were scattered "throughout the crash site." *Id*. at ¶ 120 c. The Estate alleges that "[a]s a result of the [crash] impact—and especially the sleeper berth's lack of crashworthiness—Mr. Pronin was violently thrown from where he was sleeping … and found lying face-up, covered in debris from the implosion of the cargo box, with his mouth covered in blood and a pool of blood under his head." *Id*. at ¶¶ 121-122. He was pronounced dead at the scene. Mr. Konko was not injured in the accident and the Estate claims that Mr. Pronin "would likely have remained uninjured or only minorly injured if the sleeper berth had been built as required for a passenger safety compartment." *Id*. at ¶ 124.

As stated above, this lawsuit was originally brought as an insurance coverage dispute, but the Estate has filed multiple cross and third-party claims against several parties, including DNTA, Houston Freightliner, PIT, Aman Expedite, Mr. Konko, and several other entities and individuals. Relevant to the instant motion, the Estate alleges that the Freightliner was defective because DNTA failed to equip the truck with forward collision warning, automatic emergency braking, and/or active brake assist technologies, and this defect was the proximate cause of Mr. Pronin's death. The Estate brings strict products liability and a wrongful death claims against the truck manufacturer. DNTA moves to dismiss these claims pursuant to Fed. Rule Civ. P. 12(b)(6).

### III.  STANDARD OF REVIEW

To survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a complaint must state a cognizable theory, and must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035,

1041 (9th Cir. 2010). The plaintiff must plead sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 at 678. In considering a motion to dismiss, the Court must take all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012).

## IV. DISCUSSION

DNTA argues that the Estate's products liability and wrongful death claims against it must be dismissed as a matter of law because the Estate has failed to plausibly allege that a product designed, manufactured, and/or sold by DTNA was the proximate cause of Mr. Pronin's death. To the contrary, DTNA argues, the third-party complaint expressly alleges that Mr. Pronin's death was caused by the shoddily constructed sleeper berth that was added to the Freightliner *after* it left DNTA's control. Thus, it is entitled to dismissal from this lawsuit because it is not the manufacturer of the "relevant product" that injured Mr. Pronin.

The Washington Products Liability Act ("WPLA") is the exclusive remedy for product liability claims under Washington law. *Nelson v. Sandvik Mining and Const., Inc.*, 2012 WL 6056547, *2 (W.D. Wash. Dec. 6, 2012). Under the WPLA, a manufacturer may be liable for the construction or negligent design of the "relevant product" if that product is not reasonably safe when it left the manufacturer's control and it was the proximate cause of the plaintiff's injury. RCW 7.72.010(2); RCW 7.72.030(2). The WPLA defines the "relevant product" as "that product or its component part or parts, which gave rise to the product liability claim." RCW 7.72.013(3). Thus, courts applying Washington law have determined that where a component of a whole product can be

identified as the cause of the injury, that component, rather than the product as a whole, is the "relevant product" for purposes of the WPLA. *See, e.g., Parkins v. Van Doren Sales, Inc.* 724 P.2d 389, 393 (Wash. App. 1986) ("If we consider the entire [pear processing] assembly as a unit and inquire whether there was liability as a component manufacturer or supplier, the 'relevant product' is the component if the component gave rise to the product liability claim" and because the plaintiff was injured by particular parts, "as opposed to other equipment which made up the pear processing unit, those parts constitute 'relevant' products for the purposes of the [WPLA]" rather than the pear processing line as a whole); *Nelson*, 2012 WL 6056547, *2 (W.D. Wash. Dec. 6, 2012) (concluding that two optional parts added to a drill were the "relevant products" under the WPLA as opposed to the drill itself); *Progressive Northern Ins. Co. v. Fleetwood Enterprises, Inc.*, 2006 WL 1009334, *4 (W.D. Wash. April 14, 2006) (noting that "where a particular component can be identified as giving rise to the claim, that component, rather than the end product as a whole, may be considered the relevant product" and thus concluding that the chassis, engine, or faulty wiring were the "relevant products" under the WPLA as opposed to the overall motor home). Moreover, these same courts have held that where a manufacturer had no role in the manufacture and/or incorporation of the defective "relevant product" that caused the injury into the whole product, that manufacturer is not liable for the claimant's injury. *See Nelson*, 2012 WL 6056547, *2 (W.D. Wash. Dec. 6, 2012) (dismissing claims against the drill manufacturer that did not manufacture or install optional parts installed on drill); *Fleetwood Enterprises, Inc.*, 2006 WL 1009334, *4 (W.D. Wash. April 14, 2006) (dismissing claims

against motor home manufacturer that did not install engine, chassis, or faulty wiring in motor home).

DNTA argues that like the forgoing manufacturers, it too must be dismissed from this lawsuit because, accepting the allegations in the third-party complaint as true as the Court must do at this stage of the litigation, Mr. Pronin died due to the shoddy construction of the sleeper berth that was added to the Freightliner after the truck left DNTA's control, as opposed to any defect in the Freightliner itself. This Court agrees with DNTA. The third-party complaint unequivocally alleges that: (1) the accident was not "particularly violent"; (2) the impact did not "cause any intrusion into the Freightliner['s] passenger safety compartment"; (3) the Freightliner's passenger safety compartment as constructed "proved more than adequate to remain intact and protect is occupants"; (4) Mr. Konko who was riding in the passenger safety compartment "was uninjured" in the accident; (5) Mr. Pronin was in the sleeper berth at the time of the accident; (6) Mr. Pronin was "violently thrown" during the accident "especially" because the sleeper berth was not "crashworth[y]"; and (7) Mr. Pronin "would likely have remained uninjured or only minorly injured" if the sleeper berth had been properly constructed. Dkt. No. 78 ¶¶ 117-124. Thus, based on the Estate's own allegations in the third-party complaint, the "relevant product" that caused Mr. Pronin's injuries is the after-market sleeper berth that was added to the truck *after* it left DNTA's control, not the Freightliner itself. Because DNTA did not manufacture or install the sleeper berth, it is not liable for Mr. Pronin's injuries.

The Estate attempts to avoid this outcome by arguing that the Freightliner, as a whole, was defective because DTNA failed to equip the truck with automatic emergency

7

braking technology. According to the Estate, the lack of an automatic emergency braking system "directly and proximately caused" Mr. Pronin's death because the accident would not have happened had the Freightliner been equipped with this technology. However, this is not what the third-party complaint alleges. While the third-party complaint does allege that the accident would not have occurred but-for the fact that the Freightliner was not equipped with automatic braking technology, it does not allege that the absence of this technology was the proximate cause of Mr. Pronin's death. Instead, the third-party complaint alleges that Mr. Pronin died because he was "violently thrown" during the accident "especially" because the sleeper berth was not "crashworthy[y]" and further alleges that Mr. Pronin "would likely have remained uninjured" if he was not in the sleeper berth at the time of the accident. Dkt. No. 78 at ¶¶ 117-124. The remaining facts of the third-party complaint as alleged bear this out: Mr. Konko was in the *same* accident in the *same* Freightliner with the *same* absence of automatic braking technology, yet he walked away from the accident unscathed. The only difference is that Mr. Konko was riding in the part of the Freightliner that had not been modified after leaving DNTA's control. Indeed, the third-party complaint alleges that the Freightliner's "passenger safety compartment"—where Mr. Konko was sitting at the time of the accident—"proved more than adequate to remain intact and protect its occupants … ." *Id*. at ¶ 119. Stated differently, the third-party complaint alleges that both men were involved in the same accident involving the same allegedly defective Freightliner, but only the man in the after-market sleeper berth suffered any harm. Mr. Konko remained perfectly safe in the part of the Freightliner that remained as it was when it left DNTA's control. Thus, Mr.

Pronin's death cannot be reasonably attributed to the lack of automatic braking on the Freightliner.[1]

The Estate also argues that Washington courts have endorsed a lower standard for causation in products liability cases. The Estate is correct that Washington courts have recognized limited circumstances in which a plaintiff must only show that a manufacturer's conduct was among other sources of harm, known as the "substantial factor" standard. However, these same courts have made clear that the "change from the 'but-for' test to the substantial factor test is normally justified only when a plaintiff is unable to show that one event alone was the cause of the injury." *Roemmich v. 3M Company*, 509 P.3d 306, 314 (Wash App. 2022). Thus, Washington courts have applied the substantial factor standard in cases involving multiple sources of toxic materials such as asbestos where a plaintiff cannot trace the asbestos from a certain source to their mesothelioma diagnosis. In those cases, the substantial factor test requires a plaintiff to simply show that a defendant contributed to the "total cloud" of toxic materials to which the plaintiff was exposed. *Id.* quoting *Mavroudis v. Pittsburgh-Corning Corp.*, 935 P.2d 684 (Wash. App. 1997). Here, there is no cloud of toxic materials or other circumstances robbing the Estate of the ability to establish but-for causation against the cause of Mr. Pronin's death. The Estate has clearly alleged that the after-market sleeper berth caused the harm at issue in this case.

---

[1] The third-party complaint is replete with allegations that DNTA understood and acknowledged that technologies such as forward collision warning, automatic emergency braking, and/or active brake assist can dramatically decrease the risk to those who use this country's roadways. That very well may be true, but the facts as alleged in this case establish that such technologies were not necessary to prevent the injuries suffered by Mr. Pronin in this particular accident.

## V. CONCLUSION

For the foregoing reasons, the Court concludes that the Estate's claims against DNTA fail as a matter of law and must be dismissed. The Estate requests leave to amend the third-party complaint in the event that this Court grants DNTA's motion to dismiss and the Ninth Circuit has instructed that such leave shall be freely granted. *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000). Therefore, the Court grants the Estate's request; the Estate shall file amended claims against DNTA, should it choose to do so, no later than September 18, 2024.

Dated this 30th day of August 2024.

Barbara Jacobs Rothstein
U.S. District Court Judge